IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br><br><br>vs.<br><br><br><br>MIGUEL ANGEL AGUADO-GARCIA,<br><br>      Defendant. | **ORDER AND MEMORANDUM DECISION**<br><br><br><br><br>Case No. 2:08-CR-00447-TC |

  A grand jury indicted Defendant Miguel Angel Aguado-Garcia on one count of possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable quantity of methamphetamine in violation of 21 U.S.C. § 841(a)(1). Mr. Aguado has filed this motion to suppress evidence found in his residence during a search authorized by a search warrant. Mr. Aguado contends that the seizure of the evidence violated the Fourth Amendment for the following reasons : "1) The officers' initial entry into [Mr. Aguado's] home was illegal because there was no consent; 2) The officer's search of [the] home was illegal because there was no consent; 3) The search was not justified as a protective sweep because there were no exigent circumstances; 5) The "plain view" doctrine is inapplicable because the officer was not legally in the place and the "incriminating nature" of the object was not readily obvious; 6) because the search was illegal all of the evidence found must be suppressed; 7) the warrant to search was invalid because without the suppressed evidence there was no

nexus between the illegality and the place to be searched." (Def.'s Mem. Supp. Mot. Suppress 6-7.)

The court, after carefully weighing the evidence and the credibility of the witnesses, concludes that the government has shown that the officers were given consent to enter the residence and to do a limited sweep of the residence.  Furthermore, the evidence was in "plain view" of the officers.  Accordingly, the affidavit in support of the search warrant established probable cause and the motion is DENIED.

**FINDINGS OF FACT**[1]

On June 24, 2008, officers of the Utah County Major Crimes Task Force arrested Mr. Aguado at a location where an undercover sale of methamphetamine was to take place.  A search of Mr. Aguado's vehicle, a silver Ford Explorer, revealed a quantity of methamphetamine inside the Explorer.

The officers had earlier received information that Mr. Aguado was selling methamphetamine, that he lived at 42 South 2120 West Provo, Utah, and that he drove a silver Ford Explorer matching the description of the vehicle Mr. Aguado was driving when arrested.  Officers had seen Mr. Aguado at the Provo residence several times before June 24.

After Mr. Aguado's arrest, Officer Steve Norman began drafting an affidavit in support of a search of the residence.  Several other officers were sent to the residence "to obtain consent to search the house; if not, then to freeze the environment . . . ." (Hr'g Tr.

---

[1] Unless otherwise noted, all factual findings and citations come from the transcript of the evidentiary hearing held on September 22, 2008 ("Hr'g Tr.").  The court held a second evidentiary hearing on December 15, 2008.  Sergeant Aaron Mullins was the only witness.  No transcript has been made of this hearing.

10.) Special Agent Carlos Gamarra of Immigration and Customs Enforcement and Special Agent Paul Bingham of the Federal Bureau of Investigation were among the officers sent. Both men testified at the hearing and both testified that they were fluent Spanish speakers.

When the agents arrived, they saw a young woman (Mr. Aguado's sister) outside the residence holding a watering hose. Agent Gamarra asked the young woman if she lived there and would she get her parents. At this point in the evidence, there is a clear conflict. Both Agents Gamarra and Bingham unequivocally testified that they identified themselves as police officers. Mr. Aguado's sister and mother, both of whom testified at the hearing, dispute this. As explained below, the court finds the officers' testimony more credible and concludes that the agents did, in fact, identify themselves as law enforcement.

Ms. Aguado entered the residence and the two agents waited for her on the porch. Again this testimony is disputed and again, as explained below, the court concludes that the agents' testimony was more credible. Mr. Aguado's mother, Mrs. Raquel Aguado, came out of the residence and spoke to the agents. Because she did not speak English, Agent Gamarra spoke to her in Spanish. Agent Gamarra identified himself as a law enforcement officer, told her that they needed to speak with her, and asked if they could come inside. Mrs. Aguado consented.

The question of consent is the controlling point here. Not surprisingly, the parties' positions are diametrically opposed: the agents insist that Mrs. Agaudo asked them to come in; Mrs. Agaudo and her daughter deny this. According to Mrs. Raquel

Aguado and her daughter, the agents entered uninvited.  The court accepts the testimony of the agents.

Here are the court's reasons for accepting the agents' testimony regarding whether they identified themselves and whether they were given consent.  First, based on common sense and the court's experience in these matters, it is the court's belief that officers have a significant interest in identifying themselves as belonging to law enforcement.  People are, in general, more likely to listen to and give weight to what is told them by law enforcement officers. What's more, as a matter of safety, officers identify themselves to ease the fear people often have when approached by strangers.  Certainly, before entering a residence, officers want to ensure that the residents are aware of who they are and that they are not possible robbers or others who could harm them.

Also, significant to the court's credibility determination was the testimony of Raquel Aquado, Mr. Aguado's mother.  She testified that she thought the officers were "boy scouts" when she saw them, based on their clothing.  (Id. at 81) ("Well, when I saw them, I thought they were those kids that in Mexico we call boy scouts"). (Id.)  The court observed Agents Gamarra and Bingham at the hearing and they did not, in any way, look like boy scouts.  Moreover, although Agents Gamarra and Bingham were on the porch speaking with Ms. Aguado, approximately four other officers were gathering in front of the residence.  It simply is not believable that Mrs. Aguado could mistake these men as boy scouts.

Moreover, the court's finding is strengthened by the testimony of Mr. Aguado's father, Francisco Aguado Sr.  Mr. Aguado Sr. testified that he was doing repairs to the bathroom in the residence and did not see the men enter.  When his daughter told him

4

that some men wanted to speak with him, he and his other son, Francisco Aguado Jr., who was helping him with the repairs, came out of the bathroom.  Mr. Aguado Sr. testified that when he first saw the officers, they were on the stairs inside the residence. They identified themselves as police officers and, according to Mr. Aguedo Sr., they were wearing "a little plaque" either hanging around their necks or pinned to their clothes."  (Id. at 90-91.)  This testimony corroborates that of Agent Gamarra that he was wearing his badge around his neck and that of Agent Bingham who testified that his badge was on his belt.  (Id. at 16, 24, 44.)

Finally, the court is mindful that both Mr. Michael Aguado and his brother, Francisco Aguado Jr., have been charged with criminal offenses based, at least in part, on the evidence found during the search of the residence. (Michael Aguado faces the federal charges that are the basis of this case; Francisco Aguado Jr. has been charged in the State court.  (Id. at 101.))  This fact provides a strong motive to family members to testify in a way that would lead a court to suppress the evidence.

Because the court concludes that the testimony of Raquel Aguado and her daughter was not credible concerning whether the officers identified themselves as law enforcement and accepts the testimony on that point of Agents Gamarra and Bingham, the court also finds that the testimony of Agents Gamarra and Bingham that Mrs. Raquel Aquado consented to their entry into and the subsequent sweep search of the residence more believable and persuasive.  Accordingly, on those issues the court finds the following:

Once Agent Gamarra and Agent Bingham identified themselves as law enforcement, they asked Raquel Aguado if they could come inside and speak with her.

5

Ms. Aguado agreed.  Inside the house, Agent Gamarra asked if they could go into the living room to talk.  Raquel Aguado said yes and, at that point, Mr. Aguado Sr. and Mr. Francisco Aguado Jr. came out of the bathroom.  Agent Gamarra asked Raquel Aguado if the other police officers, who were waiting outside, could come in and "make sure no one else was inside the house, because we needed everyone upstairs so we can talk to them.  She says yes, it was okay."  (Id. at 15.)  Agent Gamarra turned to the officers and said, "It's okay.  You can go in and see if there's anybody else here."  (Id. at 36.)

Sergeant Aaron Mullins, a nineteen-year veteran of the Provo, Utah Police Department, was one of the officers who came into the residence.  At the December 15 Hearing, Sergeant Mullins described his discovery of methamphetamine under Defendant Miguel Aguado's bed. Sergeant Mullins testified that as he stood in the doorway of Mr. Aguado's bedroom, he saw that the bed was elevated about eight to nine inches from the floor.  Under the bed, Sergeant Mullins could clearly see a clear plastic bag containing a white powder, which Sergeant Mullins believed was a narcotic.  Sergeant Mullins entered the room and looked under the bed because, as he explained, there was sufficient space for a person to hide under the elevated bed and Sergeant Mullins wanted to be sure noone was under the bed.  Sergeant Mullins saw that the white powder had a crystalline appearance, leading him to believe that it was methamphetamine.

Next to the large plastic bag was a scale, a box of plastic bags, and several other smaller plastic bags. Sergeant Mullins did not touch anything under the bed but did report what he had seen to other officers.  This information was included in the affidavit in support of the search warrant.

For the most part, the parties agree about the remaining events. The four members of the Aguado family and Agents Gamarra and Bingham went into the living room.² Agent Bingham told Francisco Agaudo Sr. that his son, Miguel had been arrested for drug trafficking. Agent Bingham asked Mr. Aguado Sr. if the officers could search the residence. Although Mr. Aguado Sr. said it would be alright, he insisted that he be allowed to accompany the officers during any search. He also refused to sign a written consent. The agents decided they would wait for the search warrant before conducting a full search of the residence.

The warrant did not arrive for four or five hours. The officer who obtained the warrant and signed the affidavit in support of the warrant, Steve Norman, testified at the hearing that "I wanted to make sure every bit of the information that I had obtained was correct in the affidavit, everything that was going to be pertinent to the investigation to obtain the affidavit and the search warrant was in there." (Id. at 59.) Before submitting the affidavit and proposed warrant to a judge, Officer Norman gave the documents to a county prosecutor for review. Once the documents were returned, Officer Norman found a judge to sign the warrant (By this time, it was close to 11 p.m.). Officer Norman did not attempt to get a telephonic warrant.

**CONCLUSIONS OF LAW**

<u>Mrs. Raquel Aguado Consented to the Agents' Entry into the Residence.</u>

"Consent can justify an entry into a home, regardless of whether there is probable cause." <u>United States v. Cruz-Mendez</u>, 467 F.3d 1260, 1265 (10th Cir. 2006) (citing <u>United States v. Sawyer</u>, 441 F.3d 890, 894 (10th Cir. 2006)). "But consent is valid only

---

² There is a dispute about whether the agents searched Francisco Auguado Sr. and Francisco Aguado Jr. Because, if such a search did occur, no evidence was found, the court finds that this dispute is not material.

if it is 'freely and voluntarily given.'" Id.  "Whether consent satisfies this requirement is 'a factual determination based on the totality of the circumstances.'" Id.

Based on the factual findings discussed above, the court finds that Agent Gamarra and Agent Bingham identified themselves as law enforcement and when asked, Raquel Aguado voluntarily and freely gave consent for the officers to enter her house.

<u>Ms. Raquel Aguado Consented to the Officers' Sweep of the Residence</u>.

The government admits that exigent circumstances would not justify the initial search of the residence.  But again, based on its factual findings, the court concludes that Raquel Aguado voluntarily and freely gave her consent for the officers to conduct a protective sweep of the residence.

<u>The Methamphetamine was in Plain View</u>

It is important to note that the methamphetamine was not seized when Sergeant Mullins officer saw it under the bed.  Rather, Sergeant Mullins observed it and left it under the bed until the officers returned with the search warrant.  Consequently,  as the Tenth Circuit stated in <u>United States v. Cruz-Mendez</u>, 467 F.23d 1260, 1266 (10th Cir. 2006), "For a mere observation to be valid, the only requirement is that the officer be lawfully in a position from which he can view the object." (citations omitted.)

But even if the officers had actually seized the methamphetamine before the search warrant arrived and not just observed it,  the seizure was justified. "Under the plain view doctrine, police officers may properly seize evidence of a crime if (1) the officer was lawfully in a position from which the object seized was in plain view, (2) the object's incriminating character was immediately apparent (i.e., there was probable cause to believe it was contraband or evidence of a crime), and (3) the officer had a lawful right

8

of access to the object." United States v. Thomas, 372 F.3d 1173, 1178 (10th Cir. 2004.) Here, Sergeant Mullins could see that the clear plastic bag contained a white powder which he believed to be narcotics. And nothing impeded his lawful access to the bag.

### The Wait for the Search Warrant was not Unreasonable

The final argument made by Mr. Aguado is that the four to five hour wait before the search warrant arrived was unreasonable and as a result, the evidence should be suppressed. But Officer Norman, who drafted the affidavit and the warrant, testified that he wanted to be sure that he included all the relevant information in the affidavit and warrant. Officer Norman also took the additional step of having a prosecutor review the materials. Finally, Officer Norman had to find a judge to sign and issue the warrant. The court is persuaded that these procedure were necessary and the resulting delay was not unreasonable.

**CONCLUSION**

With the information about the methamphetamine under the bed, the affidavit established probable cause to believe that there was methamphetamine located in the residence. Accordingly, Mr. Aguado's motion is DENIED.

DATED: December 17, 2008.

*Tena Campbell*
_____
TENA CAMPBELL, Chief Judge
United States District Court